IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TRAVELERS INSURANCE a/s/o ) <br> VERA BRADLEY DESIGNS, and ) <br> VERA BRADLEY DESIGNS, ) <br> ) <br> Plaintiffs, ) <br> v. ) <br> ) <br> PANALPINA INC., et al., ) <br> ) <br> Defendants. ) | Case No. 08 C 5864 <br><br> Judge Virginia M. Kendall |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Travelers Insurance and Vera Bradley Designs (collectively "Vera Bradley") sued Defendants Panalpina, Inc. ("Panalpina"), ITG Transportation Services, Inc. ("ITG"), and Buckley Transportation, Inc. ("Buckley") (collectively "Defendants") alleging violation of the Carmark Amendment.[1] Vera Bradley also alleges a common law bailment count against Buckley.[2] Vera Bradley moves for partial summary judgment on Counts II and III, which alleged that ITG and Buckley violated the Carmark Amendment. Specifically, Vera Bradley seeks summary judgment against ITG on the issue of liability, claiming that ITG was a "carrier" instead of a "broker," and therefore liable under the Carmack Amendment for damage caused to Vera Bradley's shipment of pajamas. In addition, Vera Bradley moves for summary judgment against Buckley on the issue of liability. In turn, ITG filed a motion for summary judgment, claiming it was a "broker" and not a

---

[1] Panalpina, Inc. and the Plaintiffs agreed to a stipulation that dismissed Panalpina from the case. (R. 40.)

[2] Because liability against Buckley under the Carmack Amendment would preempt Vera Bradley's state law claim of bailment, Vera Bradley only addressed the Carmack Amendment claim in its Motion for Summary Judgment.

"carrier." For the reasons stated below, the Court grants in part and denies in part Vera Bradley's Motion for Summary Judgment and denies ITG's Motion for Summary Judgment.

## STATEMENT OF UNDISPUTED FACTS[3]

### I. Destruction of Vera Bradley's Pajama Container

This case involves the destruction of Vera Bradley's pajamas while en route from Elwood, Illinois to Vera Bradley's warehouse in Roanoke, Indiana. (VB 56.1 Resp. ITG ¶¶ 15, 19.) The pajama shipment originated in Hong Kong and entered the United States in Seattle, Washington. (ITG 56.1 Resp. VB ¶ 6.) The shipment was packaged in a container comprising 1,112 cartons of 100% cotton women's pajamas. (ITG 56.1 Resp. VB ¶ 6.) Hanjin, the company that transported the pajamas from Hong Kong to Seattle, then sent them by rail to the Burling Northern Santa Fe rail yard in Elwood, Illinois, just outside Chicago. (ITG 56.1 Resp. VB ¶ 6.) The container arrived at the rail yard on February 20, 2007. (VB 56.1 Resp. ITG ¶ 11.)

Vera Bradley retained Panalpina to coordinate transportation by truck of the container from the rail yard to Vera Bradley's warehouse in Roanoke, Indiana. (ITG 56.1 Resp. VB ¶ 7.) On February 19, 2007, a day before the container arrived at the rail yard, Panalpina issued a Delivery Order "dispatching" the shipment to ITG. (ITG 56.1 Resp. VB ¶ 10.) During this time, ITG had a property broker's license but not a license to be a carrier of goods. (VB Resp. ITG Add. Facts ¶¶ 7,

---

[3] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to ITG's Response to Plaintiff's Statement of Material Facts have been abbreviated to "ITG 56.1 Resp. VB ¶ __."; citations to Vera Bradley's Response to ITG's 56.1 Statement of Additional Facts have been abbreviated to "VB Resp. ITG Add. Facts ¶ __."; citations to Vera Bradley's Response to ITG's Statement of Material Facts in Support of its Motion for Summary Judgment have been abbreviated to "VB 56.1 Resp. ITG ¶ __."; citations to ITG's Reply to Vera Bradley's Response to ITG's Statement of Material Facts have been abbreviated to "ITG 56.1 Reply to VB Resp. ¶ __."; citations to Vera Bradley's Reply to ITG's Response to Vera Bradley's Statement of Material Facts have been abbreviated to "VB 56.1 Reply to ITG Resp. ¶ __."; and citations to Vera Bradley's Response to Buckley's Statement of Supplemental Undisputed Material Facts have been abbreviated to "VB 56.1 Resp. Buckley ¶ __."

2

8.) The Delivery Order identified ITG Trucking as the entity that would "deliver or transfer" the container. (ITG 56.1 Resp. VB ¶ 10.) Lisa Kernan, who tracks shipments for Panalpina, sent ITG an email with the Delivery Order that explained "attached is the delivery order for a container going to Vera Bradley. The LFD is 2/20, so please pull this container and hold in the trucker's yard until Vera Bradley is able to take the container." (VB Resp. ITG Add. Facts ¶ 2.)

In the past, after Panalpina retained ITG, ITG would then contact the carrier of its choice to transport the freight in the way requested by Panalpina or the customer. (ITG 56.1 Resp. VB ¶ 25.) In this case, after receiving the Delivery Order, ITG was free to subcontract the transportation of the container to another entity. (ITG 56.1 Resp. VB ¶ 13.) ITG did this by directing a Delivery Order to Buckley ("Buckley Delivery Order"). (ITG 56.1 Resp. VB ¶ 28.) ITG and Buckley assented to the terms of the Buckley Delivery Order, which contractually obligated Buckley to transport the container from the rail yard in Elwood, Illinois to Roanoke, Indiana. (ITG 56.1 Reply to VB Resp. ¶ 15; ITG 56.1 Resp. VB ¶ 30.) The Buckley Delivery Order contained no reference to Panalpina and instructed Buckley to contact ITG about any delivery delays or deviations from the Order's terms. (ITG 56.1 Resp. VB ¶ 29.)

On February 20, 2007, pursuant to its contract with ITG, Buckley picked up the container from the rail yard and delivered it to its trucking facility in Rockdale, Illinois. (VB 56.1 Resp. Buckley ¶ 1.) Buckley was to hold the container at its facility until making the delivery to Roanoke, Indiana on February 23, 2007. (VB 56.1 Resp. Buckley ¶ 1.) In the early morning hours of February 22, 2007, a fire broke out at Buckley's trucking yard. (VB 56.1 Resp. Buckley ¶ 3.) Apparently, a tractor in the trucking yard was set on fire and rolled down a hill and collided with the trailer containing the pajamas. (VB 56.1 Resp. Buckley ¶¶ 4, 5.) The fire department arrived on the scene,

and upon opening the smoke-filled Vera Bradley trailer, smoke rushed out so the fire department hosed the inside of the trailer. (VB 56.1 Resp. Buckley ¶¶ 6, 7.) The fire and smoke from the fire damaged a portion of the pajamas inside. (ITG 56.1 Reply to VB Resp. ¶ 19.)

The cause of the fire is under investigation by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). (VB 56.1 Resp. Buckley ¶ 11.) Upon arriving on the scene, Mr. Buckley observed that gasoline had been poured into the tractors. (VB 56.1 Resp. Buckley ¶ 8). The Rockdale Police Department's report described the source of the fire as "possible arson." (VB 56.1 Resp. Buckley ¶¶ 9, 10.)

On February 26, 2007, within a few days after the fire at Buckley's trucking yard, Panalpina sent ITG a formal notice of loss, which noted that Panalpina was holding ITG responsible for the loss it sustained. (ITG 56.1 Resp. VB ¶ 15.) There is no indication that any other company received a similar notice from Panalpina. (ITG 56.1 Resp. VB ¶ 15.) Further, it was only after the fire occurred that Panalpina found out that ITG had retained Buckley to transport the container.[4] (ITG 56.1 Resp. VB ¶ 14.) Panalpina had no business relationship with Buckley during this time. (ITG 56.1 Resp. VB ¶ 17.) When Panalpina learned of the fire at Buckley's trucking yard, it considered Buckley to be ITG's subcontracted trucker. (ITG 56.1 Resp. VB ¶ 14.)

## II. The Nature of Panalpina and ITG's Business Relationship

Employees of ITG and Panalpina testified about the type of work they thought ITG conducted, which is relevant to the determination of whether ITG was a carrier or broker. Clifford Pinto, the Ocean Import Manager for Panalpina, testified that he was under the impression that ITG

---

[4] ITG objects to the use of a Panalpina report summarizing this incident for lack of foundation. (ITG 56.1 Resp. VB ¶ 14.) The Court grants ITG's objection. The exhibit is attached with no identifying marks and with no foundation laid as to the author of the report, when it was created, what it was used for, or how it is relevant.

was the trucker and would transport the container to Vera Bradley's warehouse in Indiana. (ITG 56.1 Resp. VB ¶ 11.) Earlier, however, he testified that ITG was a truck broker that arranges transportation. (ITG 56.1 Resp. VB ¶ 11.) Pinto did not know whether or not ITG would be the entity that would possess, store (if needed), and deliver the container to Vera Bradley. (VB Resp. ITG Add. Facts ¶ 8.) In fact, Pinto had no involvement with shipping the Vera Bradley container until after the fire broke out at Buckley's trucking yard. (VB Resp. ITG Add. Facts ¶¶ 9, 10.)

Lisa Kernan, who works under Pinto at Panalpina and is responsible for tracking shipments, prepared the Delivery Order that Panalpina sent to ITG. (ITG 56.1 Resp. VB ¶ 19.) At the time of the shipment, Kernan did not know whether or not ITG was a broker.[5] (VB 56.1 Reply to ITG Resp. ¶ 19.) Kernan's primary concern was that Panalpina's client, Vera Bradley, received its shipment, and she was less concerned about whether ITG was a broker, used a third party, or delivered the shipment itself. (VB 56.1 Reply to ITG Resp. ¶ 12.) In past dealings with Vera Bradley, Kernan never heard from Vera Bradley that ITG had personally delivered a shipment. (VB 56.1 Reply to ITG Resp. ¶ 15.)

Patricia Cermak is the Vice President of Marketing and Operations for ITG Transportation Services. (ITG 56.1 Resp. VB ¶ 22.) Cermak has held that position since 1986 and is the only person at ITG responsible for marketing the company. (ITG 56.1 Resp. VB ¶ 22.) On emails that Cermak sends, under her name and title it states, "ITG Services – Local Trucking Every Major City

---

[5] ITG objects to Vera Bradley's contention that "Panalpina considered the shipment to be under ITG's responsibility" because it calls for a legal conclusion. (ITG 56.1 Resp. VB ¶ 18.) ITG's objection is granted. A central issue in determining the status of a party as a carrier or broker is whether they are legally responsible for making the delivery. *See* 49 C.F.R. § 371.2(a).

N.A. – Over the Road Trucking N.A."[6] (ITG 56.1 Resp. VB ¶ 21.) Cermak made about four sales calls a year to Panalpina prior to February 2007, and in those calls she would discuss how ITG could assist Panalpina in meeting its trucking requirements. (ITG 56.1 Resp. VB ¶¶ 22, 23.) Cermak described ITG's services as transporting customers' freight "from origin to destination," after determining "where we pick it up" and "where we're delivering." (ITG 56.1 Resp. VB ¶¶ 23, 24.) Finally, John Kopp, President of ITG, testified that ITG is a broker and never takes possession of the freight. (VB Resp. ITG Add. Facts ¶¶ 18, 19.)

## **STANDARD OF REVIEW**

On cross-motions for summary judgment, each movant must satisfy the requirements of Federal Rule of Civil Procedure 56. *See Cont'l Cos. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact

---

[6] Vera Bradley also highlights ITG's website, which currently describes its services as "Local trucking." (ITG 56.1 Resp. VB ¶ 21.) The website was not in operation in 2007 when the events of this lawsuit unfolded. Thus, it is not relevant to judging the nature of the relationship between ITG and Panalpina regarding transportation of the container.

is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## **DISCUSSION**

### I. Count II: ITG's Liability Under Carmack Amendment

Count II of Vera Bradley's Complaint alleges that ITG violated the Carmack Amendment, and as a result is liable for actual or estimated damages resulting from the fire. The Carmack Amendment, however, only imposes liability upon "carriers" and "freight forwarders," not "brokers." Accordingly, Vera Bradley moves for summary judgment on the issue of liability, claiming that ITG is a "carrier" or "freight forwarder," and judgment as a matter of law is appropriate. ITG also moves for summary judgment on the basis that it escapes liability under the Carmack Amendment because it was a "broker" that merely facilitated the transportation of the pajamas from the BNSF to Vera Bradley's Roanoke, Indiana warehouse.

The Carmack Amendment to the Interstate Commerce Act allows shippers to recover against carriers for losses to property while in transit. 49 U.S.C. § 14706. The underlying purpose of the Carmack Amendment is to clarify the "carrier's liability when damage occurs to a shipper's interstate shipment." *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1415 (7th Cir. 1987). A shipper establishes a prima facie case for recovery against the carrier by showing that the shipment was

turned over to the defendant in good condition, it was damaged when it arrived at its final destination, and the damage resulted in a specific amount of damages. *Missouri Pac. R. Co. v. Elmore and Stahl*, 377 U.S. 134, 138 (1964). The defendant can rebut the prima facie case with proof that an act of God, a public enemy, the shipper, or a public authority damaged the goods. *Id.* at 137.

A "carrier [or freight forwarder] providing transportation" is liable for actual loss to property while in transit. *See* 49 U.S.C. § 14706. Accordingly, liability under the Carmack Amendment attaches only if the defendant was a "carrier" or "freight forwarder"; "brokers" are not liable. *See* 49 U.S.C. § 14706. The Interstate Commerce Act provides the starting place for this analysis by defining the terms at issue. A "carrier" refers to a "motor carrier" or a "freight forwarder." 49 U.S.C. § 13102(3). A "motor carrier" is "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). A "freight forwarder" is "a person holding itself out to the general public...to provide transportation of property for compensation and in the ordinary course of its business" meets the following three requirements: (1) assembles and consolidates shipments, (2) assumes responsibility for transporting the goods from receipt to the final destination, and (3) uses as part of the transportation process a carrier as defined by the Act. 49 U.S.C. § 13102(8). "Transportation" under the Interstate Commerce Act refers to "services related to that movement including *arranging for*, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers and property." 49 U.S.C. § 13102 (23) (emphasis added). Finally, a "broker" is "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging

for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2). The implementing regulation provides additional guidance: a motor carrier is not a broker "when they arrange the transportation of shipments which they are authorized to transport in which they have *accepted and legally bound themselves to transport.*" 49 C.F.R. § 371.2(a) (emphasis added).

ITG's status as a "carrier" or "broker" of the damaged shipment focuses on the nature of the relationship between ITG and Panalpina, not the label put on ITG's services. *See, e.g., Custom Cartage, Inc. v. Motorola, Inc.*, 98 C 5182, 1999 WL 965686, at *9 (N.D. Ill. Oct. 15, 1999) (Kocoras, J.) (conflicting examples where plaintiff referred to itself as carrier and broker not material to determining plaintiff's status for declaratory relief); *Lumbermens Mutual Casualty Co. v. GES Exposition Servs., Inc.*, 303 F. Supp. 2d 920, 921 (N.D. Ill. 2003) (Bucklo, J.) ("carrier" or "broker" analysis governed by how defendant "holds itself out to the world and its relationship to the shipper"). The inquiry into ITG's business relationship with Panalpina includes factual considerations such as how ITG holds itself out to the public and whether ITG assumed responsibility to deliver the container.

Vera Bradley claims that ITG held itself out to the public as a "trucking" company and the Delivery Order between Panalpina and ITG constituted a contractual agreement which legally bound ITG to transport the container. Vera Bradley supports this contention with the manner in which Ms. Cermak, the Vice President of Marketing and Operations for ITG, held herself out to the public. Specifically, the description on the bottom of e-mails that Cermak sends states "ITG Services - Local Trucking Every Major City N.A. - Over the Road Trucking N.A." (ITG 56.1 Resp. VB ¶ 21.) Similarly, Vera Bradley states that the nature of the contractual relationship between ITG and Panalpina shows that ITG was a carrier: (1) it is feasible that Panalpina authorized ITG to transport

9

the goods; (2) ITG subcontracted with Buckley who actually made the delivery; (3) the Delivery Order between Panalpina and ITG and the second Delivery Order between ITG and Buckley were separate, distinct contracts; (4) Panalpina never knew about the second Delivery Order or Buckley's role in transporting the containers; (5) Buckley had to report to ITG and receive directions from ITG; and (6) after the fire at Buckley's truck yard, Panalpina sent only ITG a Notice of Claim letter. In total, Vera Bradley contends these facts emphasize ITG's discretion over how to carry out the delivery and evidences a legal obligation to transport the goods itself. *See, e.g., Custom Cartage*, 1999 WL 965686, at *8 (discretion to hire another company to transport goods shows authorization and responsibility for making the shipment).

In contrast, ITG claims there is evidence that disputes Vera Bradley's characterization of ITG as a carrier. First, ITG argues that a dispute as to a genuine issue of material exists because ITG holds a broker's license and not a carrier's license. Second, Clifford Pinto, Panalpina's Ocean Import Manager, testified that ITG was a broker that "arranges transportation." (ITG 56.1 Resp. VB ¶ 11.) Third, John Kopp, the President of ITG, testified that ITG consistently held itself out to the public as a "broker" and "never" takes possession of the freight. (ITG 56.1 Resp. VB ¶ 21.) Fourth, ITG refers to a hand-written note on the Delivery Order between Panalpina and ITG that reads "Sent to ITG to request trucking." Finally, ITG claims that Buckley's President William Buckley did not believe ITG was a freight forwarder.

The facts ITG asserts do not create a genuine issue of material fact. First, a broker's license is not dispositive evidence that the defendant is a broker; rather, the heart of the analysis is the relationship between the two relevant parties. *See, e.g., Phoenix Assurance Co. v. K-Mart Corp.*, 977 F. Supp. 319, 326 (D. N.J. 1997). As such, the broker's license itself does not end the analysis

but is only one factor to consider. Second, a carrier can be a party that arranges transportation if that party assumes authority and responsibility for transporting the goods. *See* 49 C.F.R. § 371.2(a). Third, Pinto's testimony that ITG "arranges" transportation is also not conclusive as to whether ITG is a carrier or broker. Any label given to the status of ITG is not dispositive either. *See, e.g., Custom Cartage Inc.*, 1999 WL 965686, at * 9. Accordingly, Kopp's references to his own company throughout his deposition as a "broker" or "middle man" does not create a dispute as to ITG's status. Along similar lines, ITG provides no foundation for the handwritten note on the Delivery Order that read "Sent to ITG to request trucking," and it also fails to create a genuine issue as to ITG's status. Finally, Buckley testified that a freight forwarder is a "person involved in moving it [goods] from another country to here," and ITG was not a freight forwarder, but this testimony does not refute facts showing that ITG assumed responsibility for transporting the shipment and used a carrier to achieve that purpose.

The undisputed facts establish that ITG was a carrier. First, the Delivery Order sent from Panalpina to ITG indicated that ITG Trucking would "deliver" the container. This Delivery Order established an obligation to transport the container and ITG fulfilled this obligation by contracting with Buckley to make the delivery. *See, e.g., Mach Mold Inc. v. Clover Associates, Inc.*, 383 F. Supp. 2d 1015, 1030 (N.. Ill. 2005) (Coar, J.) (it was reasonable to conclude that plaintiff authorized defendant to deliver the product because defendant contracted with another company to fulfill the obligation); *AIOI Ins. Co. v. Timely Integrated, Inc.*, No 08 C 1479, 2009 WL 2474072, at *2-3 (S.D.N.Y. Aug. 12, 2009) (defendant was carrier because it arranged for shipment of the goods by contracting with a third party to deliver the shipment). Under this Deliver Order, Buckley was to report delivery problems directly to ITG. Second, after the fire at Buckley's trucking yard, Panalpina

sent only ITG the Notice of Loss. This is further evidence that Panalpina perceived ITG as being the party responsible for making delivery. Finally, ITG never informed Panalpina that Buckley would transport the shipment. In fact, Panalpina never knew Buckley was involved until after the fire. In sum, under the Carmack Amendment, ITG was not a broker because it assumed responsibility for the shipment and used another carrier, Buckley, to fulfill its obligation. The Court therefore grants Vera Bradley's Motion for Partial Summary Judgment and denies ITG's Motion for Summary Judgment.

## II. Count III: Buckley's Liability Under Carmack Amendment

Vera Bradley also claims that Buckley is liable under the Carmack Amendment because it was the carrier in possession of the container when the damage occurred. Buckley, however, argues that even if Vera Bradley can establish a prima facie case of liability under the Carmack Amendment, it is free from liability because an act of arson caused the fire. In an action to recover losses caused by damages to a shipment of goods, a plaintiff establishes a prima facie case if three elements are met: (1) delivery to carrier in good condition, (2) arrival in damaged condition, and (3) amount of damages. *Missouri Pac. R. Co.*, 377 U.S. at 138; *Allied Tube & Conduit Corp. v. Southern Pacific Transp. Co.*, 211 F.3d 367, 369 (7th Cir. 2000). Upon this showing, the burden shifts to the defendant to establish a legally valid excuse, such as acts of God or damage caused by the public enemy or public authority. *Allied Tube & Conduit Corp.*, 211 F.3d at 369.

Federal courts have not directly addressed the issue of whether arson is the type of conduct that falls under the "public enemy" defense. However, courts have indirectly indicated that arson may constitute that defense. *IBM Corp. v. Fernstrom Storage & Van Co.*, 82 C 4089, 1985 WL 1111, at *3 n.4 (N.D. Ill. May 6, 1985) (Decker, J.) (defendant made no showing that fire was caused

by "arson (possible public enemy)" and therefore was liable); *Brockway-Smith Co. v. Boston and Maine Corp.*, 497 F. Supp. 814, 820 n.9 (D. Mass. 1980) (arson "may be the act of a public enemy"). Here, it would be premature for the Court to make this determination because the cause of the fire has yet to be determined. Although a police report after the fire indicated that a "possible arson" was the cause, the matter is currently under investigation by the ATF. (VB 56.1 Resp. Buckley ¶¶ 10, 11.) Vera Bradley's Motion for Summary Judgment as to Buckley's liability is therefore denied.

## CONCLUSION AND ORDER

For the reasons stated, Vera Bradley's Partial Motion for Summary Judgment is granted as to ITG, but denied as to Buckley. ITG's Motion for Summary Judgment is denied.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: September 30, 2010